UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-12061-RGS

PHILIP MACDONALD

v.

TOWN OF EASTHAM, NORMAN SYLVIA,
KATE MUNGOVAN, and TERRY DINAN

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION TO DISMISS

May 24, 2013

STEARNS, D.J.

In this action, Philip Macdonald seeks damages to redress alleged violations of the Fourth Amendment and various state laws arising from a warrantless search of his home and his subsequent prosecution in state court based on the fruits of that search. Defendants Town of Eastham, Eastham police officers Norman Sylvia and Kate Mungovan, and Barnstable County Sheriff's Department employee Terry Dinan move to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, defendants' motion will be allowed.

BACKGROUND

The well-pleaded facts alleged in the Complaint are as follows. *See S.E.C. v. Tambone*, 597 F.3d 436, 438 (1st Cir. 2010) (en banc). At approximately 1:00 p.m.

on November 7, 2009, Macdonald left his house with his dog and drove to a nearby beach to dig clams, stopping for a coffee along the way.  As he often did when away for a short period of time, Macdonald left the side entrance of the house open to permit his cat to roam freely.

Forty-five minutes later, a dispatcher at the Town of Eastham Police Department received a call from Georgia Hawko, a neighborhood watch captain who lived in a house adjoining Macdonald's property.  Hawko stated:

> This is Georgia Hawko.  I am a neighborhood watch and I see a house that nobody's home but the door is wide open, both the screen and the front door, and I don't know if I should be concerned, if they just ran out and left it open or what's going on.

Compl. ¶ 11.

Eastham police officers Sylvia and Mungovan were sent to investigate.  Upon arrival, they spoke briefly with Hawko, who told them that Macdonald's door was wide open and that, to her knowledge, no one was home. The officers then proceeded to Macdonald's house.  They announced their presence and, after receiving no response, walked through the open door into the kitchen.  Sylvia reported in a radio transmission upon entering that "[s]o far it appears that somebody just left their door open.  There are definitely people staying here."  Compl. ¶ 17.  The officers then proceeded to conduct a sweep of the house, during which they observed marijuana

plants growing upstairs and in the basement.

Macdonald returned home at approximately 2:15 p.m. to discover police cars in his driveway and Officers Sylvia and Mungovan in his living room. The officers told Macdonald that they had found marijuana and that the house was now a crime scene. Macdonald was frisked, read his Miranda rights, and detained. Following the issuance of a search warrant, Officers Sylvia and Mungovan, Eastham Detective Benjamin Novotny, and Sheriff's Department employee Dinan conducted a second search of the home, looking inside closets, drawers, and cabinets. Macdonald several times asked them individually and collectively to stop the search and leave the property. Each request was refused.

On November 25, 2009, Detective Novotny, the officer in charge of the investigation, submitted an application for a criminal complaint against Macdonald in the Orleans District Court.[1] Three days later, Macdonald, through his attorney, provided Novotny with a legal memorandum asserting that the initial entry into the house by Officers Sylvia and Mungovan was unlawful and requesting that no criminal complaint be pursued. At a January 27, 2010 hearing, the clerk magistrate asked

---

[1] A prior complaint that had issued on or about November 16, 2009, was dismissed for failure to provide Macdonald with an opportunity to be in heard in opposition to the issuance of the complaint, a right afforded to a person not then under arrest. *See* Mass. Gen. Laws ch. 218, § 35A.

Novotny whether anything could be done short of issuance of the complaint. Novotny replied in the negative, requesting that the matter be referred to the District Attorney. The complaint then issued. Macdonald was charged with knowingly or intentionally manufacturing a Class D controlled substance (marijuana) in violation of Mass. Gen. Laws ch. 94C, § 31.

Macdonald filed a motion to suppress in the state district court challenging the legality of the search. He contended in a July 13, 2010 motion and accompanying memorandum that the initial search of his home was unlawful because it was conducted without a search warrant. He also argued that neither the emergency exception nor the community caretaking doctrine excused the failure to obtain a warrant. At a subsequent evidentiary hearing, Officer Mungovan testified that she did not observe anything prior to or immediately upon entering Macdonald's home that indicated that there had been a forced entry, or that a burglary was in progress, or that someone might be in distress. Hawko similarly testified that she did not observe anything at or around the home suggestive of an emergency. The state district court judge granted the motion to suppress, and the criminal complaint was dismissed on September 3, 2010.

This lawsuit followed. Macdonald's Amended Complaint sets out five counts: alleged Fourth Amendment violations pursuant to 18 U.S.C. § 1983 against

individual defendants Sylvia, Mungovan, and Dinan (Counts I and II); an alleged § 1983 failure to train violation against the Town of Eastham (Count III); and common-law claims of false imprisonment and malicious prosecution against Sylvia and Mungovan (Counts IV and V). On March 3, 2013, defendants filed this motion to dismiss all counts for failure to state a claim. The court heard oral argument on May 22, 2013.

## DISCUSSION

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two underlying principles guide the court's analysis. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Tambone*, 597 F.3d at 442.

*Section 1983 Claims*

The gravamen of Macdonald's lawsuit is his claim that Sylvia, Mungovan, and Dinan violated his Fourth Amendment rights when they entered and searched his home without a warrant. Defendants, for their part, argue that their actions were legally justified and that, in any event, they are entitled to qualified immunity.

The doctrine of qualified immunity shields state officials from liability for damages under §1983 where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[T]he qualified immunity inquiry . . . allows . . . for the inevitable reality that 'law enforcement officials will in some cases reasonably but mistakenly conclude that [their conduct] is [constitutional], and . . . that . . . those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." *Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1373 (1st Cir. 1995), quoting *Anderson v. Creigton*, 483 U.S. 635, 640 (1987) (emphasis omitted). The line properly drawn is not between the constitutional and unconstitutional, but between acts that although unconstitutional are nonetheless objectively reasonable and acts that are unconstitutional on their face. *See Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004). The doctrine is not merely a defense to liability but also "a limited 'entitlement not

to stand trial or face the other burdens of litigation.'" *Iqbal*, 556 U.S. at 672, quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Accordingly, qualified immunity should be resolved at the earliest possible stage of litigation." *Rocket Learning, Inc. v. Rivera-Sanchez*, 2013 WL 1668229, at *5 (1st Cir. April 18, 2013), citing *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009).

In assessing a claim of qualified immunity at the motion to dismiss stage,[2] the court must determine "(1) whether the facts alleged by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right at issue was 'clearly established' at the time of the defendant's alleged violation." *Eldredge v. Town of Falmouth, Mass.*, 662 F.3d 100, 104-105 (1st Cir. 2011), quoting *Maldonado*, 568 F.3d at 269 (alteration omitted). The "clearly established" inquiry, in turn, has two aspects.

> One aspect focuses exclusively on the clarity of the law at the time of the alleged violation. "To overcome qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" [*Maldonado*, 568 F.3d at 269] (alteration in original) (quoting *Anderson*[, 483 U.S. at 640]). The other aspect considers the specific facts of the case at bar.

---

[2] While there is usually a benefit in resolving the constitutional question before proceeding to the qualified immunity issue, *see Wilson v. Layne*, 526 U.S. 603, 609 (1999), there are "cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Pearson v. Callahan*, 55 U.S. 223, 239 (2004).

> The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted).

*Rocket Learning*, 2013 WL 1668229, at *5. The dispositive inquiry in determining whether a right is clearly established is whether, given the contours of the allegedly infringed right and the facts of the particular case, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Brosseau*, 543 U.S. at 199.

The constitutional right implicated in this case is the Fourth Amendment right to be free from unreasonable searches and seizures. Under the Fourth Amendment, warrantless searches are per se unreasonable. *See, e.g.*, *Katz v. United States*, 389 U.S. 347, 357 (1967). This presumption has special force when it comes to the warrantless entry of a home, a "space which, for centuries, has been regarded as 'entitled to special protection.'" *Kentucky v. King,* 131 S.Ct. 1849, 1865 (2011) (Ginsburg, J., dissenting), quoting *Georgia v. Randolph*, 547 U.S. 103, 115 & n.4 (2006). The officers' warrantless entry into Macdonald's home was therefore invalid unless justified by a recognized exception to the warrant requirement. *See Michigan v. Tyler*, 436 U.S. 499, 506 (1978); *see also Camara v. Mun. Court*, 387 U.S. 523, 528-529 (1966) ("[O]ne governing principle, justified by history and by current

experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant.").

To justify their actions here, the officers invoke the community caretaking doctrine.[3]  "Community caretaking" is a catchall for the wide range of non-investigatory services expected by society of its uniformed officers.  The community caretaking doctrine recognizes that "in addition to being an enforcer of the criminal law, [the police officer] is a 'jack-of-all-emergencies,' expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect community safety." *United States v. Rodriguez-Morales*, 929 F.2d 780, 784-785 (1st Cir. 1991), quoting

---

[3] The officers do not claim that their search was justified by exigent circumstances, which various courts have found present where officers reasonably believe that a dwelling has recently been or is being burglarized. *See United States v. Tibolt*, 72 F.3d 965, 970-971 (1st Cir. 1995), citing *United States v. Erickson*, 991 F.2d 529, 533 (9th Cir. 1993) ("In a wide variety of contexts, this and other circuits have upheld warrantless searches conducted during burglary investigations under the rubric of exigent circumstances."). The law is far from "clearly established" as to whether an open door, coupled with a concerned neighbor's report that no one is at home, is sufficient to suggest that a burglary is in progress for exigency purposes. *See generally* 3 W. LaFave, Search and Seizure § 6.6(b) (5th ed. 2012) (collecting state and federal cases illustrating the differing approaches courts have taken). In this context, an officer such as Mungovan's subjective impression that no burglary had taken place at the home is irrelevant. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

3 W. LaFave, Search and Seizure § 5.4(c) (2d ed. 1987). When an officer is performing a community caretaking role, the imperatives of the Fourth Amendment are satisfied so long as his actions are reasonable. *United States v. Coccia*, 446 F.3d 233, 239 (1st Cir. 2006). In the case at bar, this requires that both the officers' decision to enter Macdonald's home and the scope of their subsequent search of the premises be "within the realm of reason." *Rodriguez-Morales*, 929 F.2d at 787. Because here the officers' search was limited to ensuring that no one was lurking inside the home, the scope of the search was properly curtailed for purposes of the caretaking doctrine. *See People v. Ray*, 981 P.2d 928, 935 (Cal. 1999).[4] The salient question, then, is whether the officers' entry was justified at its inception.

The Supreme Court first recognized the community caretaking doctrine in *Cady v. Dombrowski*, 413 U.S. 433 (1973). In *Cady*, Chicago police officer Chester Dombrowski, while on a visit to Wisconsin, reported to local authorities that he had been involved in an automobile accident. Under the impression that Chicago police officers were required to carry their service revolvers at all times and having found

---

[4] A "sweep" search, such as the one conducted here, "may extend only to a cursory inspection of those spaces where a person may be found." *Maryland v. Buie*, 494 U.S. 325, 335 (1990). There is no dispute that during the course of the sweep Officers Sylvia and Mungovan made only a visual examination of the interior of the home and did not intrude into any locked spaces or closed containers. Thus, there was no constitutional infirmity in their observation of marijuana plants in plain view. *See Mincey v. Arizona*, 437 U.S. 385, 393 (1978).

no revolver on Dombrowski's person, one of the responding officers looked into the front seat and glove compartment of the disabled vehicle for the weapon, but found nothing. The vehicle was then towed to a privately owned garage, where it was left in an unsecured area. After Dumbrowski was placed under arrest for drunken driving and taken to a local hospital, one of the officers returned to the vehicle to search again for the revolver "to protect the public from the possibility that [it] would fall into untrained or perhaps malicious hands." 413 U.S. at 443. In the trunk of the vehicle, he found and seized numerous items that linked Dombrowski to a recent homicide and ultimately contributed to his conviction for first-degree murder.

The Supreme Court held that the warrantless search of the vehicle was reasonable because it was undertaken pursuant to the officers' "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 442. In so holding, the Court emphasized the distinction between buildings and vehicles and the lesser expectation of privacy in the latter.

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. . . . The Court's previous recognition of the distinction between motor vehicles and dwelling places leads us to conclude that the type of caretaking "search"

> conducted here . . . was not unreasonable solely because a warrant had not been obtained.

*Id.* at 441-442; *see also id.* at 442 ("The constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband.").

There is a split of authority, state and federal, as to whether the community caretaking doctrine extends beyond the context of automobile searches. A majority of the federal Courts of Appeals have concluded that the plain import of the *Cady* decision is that it does not. The Ninth Circuit in *United States v. Erikson*, 991 F.2d 529 (9th Cir. 1993), for example, refused to extend the community caretaking doctrine to the warrantless search of a home on the ground that "*Cady* clearly turned on the 'constitutional difference' between searching a house and searching an automobile." *Id.* at 532, quoting *Cady*, 413 U.S. at 439. In so holding, the Court cited with approval the Seventh Circuit's conclusion that the Supreme Court "did not intend to create a broad exception to the Fourth Amendment warrant requirement to apply whenever the police are acting in an 'investigative,' rather than a 'criminal' function," but instead sought "to confine the holding to the automobile exception and

to foreclose an expansive construction of the decision allowing warrantless searches of private homes or businesses." *United States v. Pichany,* 687 F.2d 204, 208-209 (7th Cir. 1982) (per curiam) (refusing to extend the exception to the warrantless search of a business warehouse). The Third and Tenth Circuits have likewise concluded that the community caretaking doctrine cannot be used to justify a warrantless search of a home. *See Ray v. Twp. of Warren*, 626 F.3d 170, 174-177 (3d Cir. 2010); *United States v. Bute*, 43 F.3d 531, 534-535 (10th Cir. 1994).

Other courts, however, have given the community caretaking doctrine the same effect with respect to homes as to vehicles. In *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996), the Sixth Circuit invoked the community caretaking doctrine in finding no violation where officers entered a home at night without a warrant to abate a significant noise nuisance that had caused neighbors to complain. *Id.* at 1521-1522. *But see United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) ("[D]espite references to the doctrine of *Rohrig*, we doubt that community caretaking will generally justify warrantless entries into private homes."). The Eighth Circuit did the same in *United States v. Quezada*, 448 F.3d 1005 (8th Cir. 2006), where it upheld a warrantless home entry under circumstances suggesting that someone inside could be in need of immediate assistance. *Id.* at 1007-1008. Various state courts are in accord. *See, e.g., People v. Ray*, 981 P.2d 928, 934-938 (Cal. 1999) (concluding that "[u]nder

the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry [into the home]"); *State v. Pinkard*, 785 N.W.2d 592, 598 n.6 (Wis. 2010) (same, collecting cases); *State v. Deneui*, 775 N.W.2d 221, 236 n.8 (S.D. 2009) (same).

The unsettled nature of this area of the law is further compounded by a widely-shared confusion between and among the distinct doctrines of community caretaking, emergency aid, and exigent circumstances. "Some courts treat these exceptions interchangeably. Others declare that the community caretaker exception applies, but then use the law applicable to one of the other exceptions, such as the emergency doctrine." *Deneui*, 775 N.W.2d at 232; *accord Pinkard*, 785 N.W.2d at 600 n.8 (repeating *Deneui's* observation and collecting cases). The Third Circuit has observed that *Rohrig* and *Quezada*, for example, "do not simply rely on the community caretaking doctrine established in *Cady* . . . [but] instead apply what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role." *Ray*, 626 F.3d at 176.

Given this state of the law, the court need not decide whether the community caretaking doctrine justified the officers' entry into Macdonald's home on November 7, 2009. *See Maldonado*, 568 F.3d at 269-270 (noting that courts have discretion to

address the components of the qualified immunity non-sequentially). Far from being "clearly established," the law at the time of the officers' actions was distinctly unsettled. Indeed, the uncertainty persists even today. A reasonable Massachusetts police officer seeking to determine whether and under what circumstances the community caretaking doctrine justifies the warrantless entry of a home would likely turn first to state law, as it is often more restrictive than federal law in a search and seizure context. In so doing, the officer would discover that the Supreme Judicial Court has most recently noted that the question is an open one under Massachusetts and First Circuit law. *See Commonwealth v. Entwistle*, 463 Mass. 205, 219 n.8 (2012). *Entwistle* would further alert the officer to a split in authority among the federal circuit courts, which the Supreme Court has yet to resolve. *Id.* Moreover, given that the exigent circumstances exception is now clearly held by the Supreme Court to justify entries into the home, *see Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), an officer could reasonably believe that the Supreme Court might well conclude that the community caretaking doctrine does so, as well. Faced with this absence of controlling authority and conflicting precedent, a reasonable officer would not have known whether his actions violated Macdonald's Fourth Amendment rights. The officers here are therefore entitled to qualified immunity.

This conclusion fatally undermines Macdonald's failure to train claim, as well.

Macdonald alleges that the Town of Eastham "failed to maintain adequate policies and/or conduct adequate training of its police officers" relative to warrantless searches. Compl. ¶ 61. He stakes his claim not on a pattern of similar violations, but rather on the contention that the Town's allegedly deficient training created an extremely high risk that constitutional violations would ensue.

The Supreme Court has not "foreclose[d] the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011), citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997). In determining whether the need for training was "obvious," however, courts look to whether there were "clear constitutional guideposts" in the area. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 397 (O'Connor, J., concurring in part and dissenting in part); *see also id.* at 395 (explaining that "[w]ithout some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell* [*v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)], imposing liability without regard to fault."); *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 94 n.10 (1st Cir. 1994) (observing that where there are "no clear constitutional

guideposts as to the precise nature of the obligations that the [Constitution] places upon the police . . . , it is difficult to conclude that the failure to train . . . reflects callous or reckless indifference to constitutional rights"). Thus, while a municipality does not enjoy qualified immunity from damages liability resulting from an unconstitutional policy or decision, *Owen v. City of Independence*, 445 U.S. 622, 650 (1980), the conclusion that officers are immune from suit because the right allegedly violated was not clearly established also precludes municipal liability. *See, e.g.*, *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 393 (8th Cir. 2007); *Townes v. City of New York*, 176 F.3d 138, 143 (2d Cir. 1999); *Joyce v. Town of Tewksbury, Mass.*, 112 F.3d 19, 23 (1997). Macdonald's failure to train claim against the Town of Eastham must therefore be dismissed.

*Common-Law Claims*

Macdonald's common-law false imprisonment and malicious prosecution claims fare no better. False imprisonment consists of an "intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement." *Jonielunas v. City of Worcester Police Dep't*, 338 F. Supp. 2d 173, 177 (D. Mass. 2004). An arrest is "unlawful" if it is unsupported by probable cause. *Goddard v. Kelley*, 629 F. Supp. 2d 115, 129 (D. Mass. 2009). To prevail on a claim of malicious prosecution, a plaintiff must

establish that he suffered damages because the defendant commenced an action against him without probable cause and with improper purpose, and that the action terminated in his favor. *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 103, 110 (2006).

Macdonald cannot prove the lack of probable cause necessary to succeed on either of these claims.[5] Macdonald admits that the officers "discovered growing marijuana plants, grow lights, and other items" in his home. Compl. ¶ 28. Moreover, even if there were a constitutional infirmity in the officers' initial decision to enter Macdonald's home, it would not vitiate the probable cause to arrest and prosecute Macdonald based on that discovery. *See Townes*, 176 F.3d at 149 ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because . . . the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); *Padilla v. Miller*, 143 F. Supp. 2d 479, 491 (M. D. Pa. 2001) ("[T]he courts that have addressed the issue have uniformly concluded that the exclusionary

---

[5] Macdonald argues in his Opposition that there are factual issues concerning whether the marijuana recovered in the search exceeded the weight necessary to constitute a criminal offense given the passage of "An Act Establishing a Sensible State Marihuana Policy," Mass. Gen. Laws, ch. 94C, § 32L, which decriminalized the possession of one ounce or less of marijuana. Pl.'s Opp'n at 15-16. Shortly after his Opposition was filed, however, the Supreme Judicial Court held in *Commonwealth v. Palmer*, 464 Mass. 773 (2013), that the Act did not decriminalize the *cultivation* of marijuana, which is a felony offense under Mass. Gen. Laws, ch. 94C, § 32C(a). The weight of the marijuana recovered is therefore irrelevant to the issue of probable cause.

rule is not applicable in a § 1983 action.") (collecting cases); *see also Kelly v. Civil Serv. Comm'n*, 427 Mass. 75, 79 (1998) (holding that the exclusionary rule does not apply in the context of a civil proceeding, even one that is quasi-punitive in nature). The false imprisonment and malicious prosecution claims consequently fail as a matter of law.

## ORDER

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is <u>ALLOWED</u>. The Clerk will enter judgment for all defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE